The first of these is number 2010-1489, POWERTECH v. TESSERA. Mr. Lowry. Thank you, Your Honor. Good morning. May it please the Court. Matthew Lowry for the Plaintiff Appellant. POWERTECHNOLOGY, Inc., also called PTI, in the briefing. What happened in this case and the most fundamental error of the lower court is best understood by the difference between two phrases, PTI product and PTI licensed product. TESSERA has accused the PTI products of infringement, that the patents cover the PTI products, and that's subject only to what they claim is the affirmative defense and the ITC treated as an affirmative defense the fact of a license. You have a lot of stuff designated confidential, so if I start to tread on it, stop me, okay? Yes, Your Honor. I'll try not to, but there's so much that I'm going to try to phrase questions in a way you'll understand that won't reveal anything. Thank you, Your Honor. You were talking about POWERTECH product, not POWERTECH licensed product. Are you suggesting that you believe there are products that are being accused of infringement in the ITC action, which are not products for which you feel you should have to pay a royalty? That is correct. Actually, Your Honor, PTI believes it shouldn't have to pay a royalty on any products. And, in fact, in front of the lower court, and this is in the appendix at Joint Appendix Pages 2,612 and 13, they said we would go without a license on any product if the 106 patent were declared invalid. If I understand it, you're basically making two arguments. One is that there's a claim that because there was a delay in paying license fees that some of the product was unlicensed at the time and, therefore, infringing, and that's one basis for declaratory judgment jurisdiction. The other one, as I understand it, is that you say that the license agreement should be construed as not requiring payments on products that are outside the scope of the patent claims and also should not be construed to require payments on product to the extent that the patent is held invalid, correct? That's correct. Those are two alternative grounds, Your Honor. I would modify slightly the way that the first one is presented, and that's because there's no question that the PTI products were a part of the ITC investigation. At Joint Appendix Page 1429, there's a quote from Tessera before the lower court that says, PTI products could and did figure in to the ITC investigation. And then what they say is, but we don't claim that there's any issue for licensed product. Well, under MedImmune, any licensor would say that. If you pay, they're very clear, including in their briefing, I think around page 30 before this court, it's only a licensed product once the fee is paid. Until the fee is paid, that same part number, same individual unit is not a licensed product. And so before the ITC, what they were saying… Well, we had an oral argument, and I was on the panel, and we heard that argument in the ITC case on appeal here. Yes, and, Your Honor, and so what was happening in the ITC case is there was specific contentions about the PTI products infringing or being covered by the patents, and what the ITC commission found is that they were licensed, and therefore patent exhaustion meant that they wouldn't issue an exclusion order. However, the moment that the license fee is not paid, it's no longer licensed, and suddenly we're subject to an argument, a summary determination perhaps, and an argument that an exclusion order should prevent those very same products. So in that sense, this is just like MedImmune. We have a license. If we pay, we're not subject to it. But if we stop paying, we're subject to all of these problems. And that's what, Your Honor, when I responded, that I would amend the way that it's worded. We can pay… I'm a little confused because I thought there were two separate arguments here. One is the second one that I stated, that you're saying that the license agreement doesn't require payment of fees for non-infringing products and if the patent is invalid, and that that's a controversy between you and Tessera, which has nothing to do with whether they're paid up license fees because in the future you would be able to stop paying license fees if you prevail. That's the theory. Yes, Your Honor. I thought the first argument was that they are saying that quite apart from the question of whether it's covered by the patent or whether the patent is valid, there's still no obligation to recognize that the products are licensed unless the license fees were paid in advance. Your Honor is correct with respect to the second one and the dispute over the contract. And with respect to the first one, the argument or the case or controversy here is that they have contended in the ITC proceedings specifically that the patents cover all of the WBGA and micro-BGA products. That's very much like sending a letter that says our patent covers your product. It's very much like, only more so, it's very much like having a license agreement that says our patent covers your product, only more so. Well, some of those issues may be resolved either one way or the other in the appeal from the ITC proceeding, right? Yes and no, Your Honor. If the ITC proceedings were confirmed, there would still be a case or controversy here for a couple of reasons. One is there's a Texas court action that this isn't binding on. And so they could make the same arguments that they made in the ITC, perhaps prevail in the Texas court. The second reason, and perhaps more fundamental. Wait, it wouldn't be binding on the Texas court even if the Federal Circuit ruled? Yes, Your Honor, because it didn't arise up from an Article III judge. Well, it wouldn't be res judicata or collateral estoppel, but whatever we decided would be stare decisis, which I think is what Judge Morris is suggesting. But there could be additional or new arguments. There's an international exhaustion argument that wasn't raised in a timely way in the ITC that they might try to raise. There could be other arguments in addition. And it's not, as Your Honor says, collateral estoppel or res judicata. The second and perhaps more profound reason is that if it were confirmed, then what the court will have said is there's no exclusion order because they were licensed products, which is like saying there's a license. Now, under MedImmune, we don't have to actually stop paying for there to be a case or controversy. So the fact that it's confirmed that there's no exclusion order because of what had been paid for in the past doesn't remove the fact that the PTI products are asserted to be covered by the Tessera patents and that a license is required according to Tessera. And that's what creates the case or controversy. And an affirmance by the Federal Circuit doesn't remove that because the second that we don't pay a license fee, they will come in and say to the ITC, first of all, PTI products are covered. That's already been determined. And second of all, they're not licensed anymore. That was the ground, patent exhaustion. And therefore, an exclusion order should be issued immediately, which is why PTI is so anxious to have its declaratory judgment action heard. When you talk about these as alternative arguments, they really are tied together. I mean, because your whole point here is that it's your failure to pay royalties. If there's a failure to pay royalties, they become unlicensed, and therefore, your customers are at risk. Is that right? That is correct. So they're not really alternative arguments. I mean, you need the existence of your underlying license to even have this interest, right? Almost, but not quite, Your Honor, because there's two products, WBGA and micro-BGA. And for the WBGA, there's been a determination that, at least in the ITC, and assuming that doesn't change in the Texas court case, that the patent doesn't cover WBGA. They, Tessera, would maintain we still have to pay on WBGA, notwithstanding that determination. I'm a little confused. I would have thought that your answer to Judge O'Malley's question would be that the issue about whether they were current in the license payments affects past infringement contentions and that the question of whether there's a future obligation to pay under the license agreements is a separate question from that. No? It is a separate question because we have the DJ on the patent side and the risk of patent remedies. We also have a DJ on the contract side in terms of what- Well, but just to be clear about it, you say even if we are licensed now, even if the product that was produced under the license is protected from an infringement action, even though there is no current controversy with respect to past product, there is still the question of whether we can stop paying the license fees in the future because the product is not infringing and the patent is invalid. Yes, Your Honor. That is the contract part, and it's separate from the patent part. But the contract part is do we have to keep paying license fees on WBGA where the ITC found no infringement and micro-BGA where the ITC did find infringement? Do we have to keep paying? And that turns, and Tessera maintains, it's a product license. It doesn't matter if our patent covers what you sell. You have to pay us anyway. We say that's not the way that the patent license should be read. So that's the declaratory judgment on the contract. So as to your secondary argument that you just discussed with Judge Dyke, the contract interpretation is critical to that. The contract interpretation is critical to that. It's irrelevant to the first part, but it's critical to the second part. Yes, Your Honor, precisely. And you asked for discovery as it relates to the contract issue. What is it that you expect that discovery would show relating to the party's intent? I think that there will be a lot of things that discovery could show, including the fact that Tessera drafted this agreement, which I don't think comes out in the record below, that PTI had no counsel in it, so it should be construed against the drafter, that other parties with the same language in the discussions with Tessera actually show that they also think, reading that language, that it is a patent license and not a product license. And really just a more fully developed record. I mean this was resolved on a motion to dismiss for lack of subject matter jurisdiction, and the record didn't, with discovery and with everything else, wasn't as fully developed as I think it should have been in order for there to be a judgment on what's really a pretty important issue. So your argument on the contract is that it's ambiguous or that it's unambiguous the other way? It's, I guess, both actually, Your Honor. It is ambiguous, but that read as a whole, one would read it as being a patent license. I mean in the recitals, the very first two things that occur in the contract is that the patents are required to do these things. That's not true, as it turns out. It may have been true before, which part of the timing on this was there were three patents in the ITC case, two of them expired in September of 2010, which is why the DJ on just the 106 became so much more of a ripe issue. Speaking of the DJ, can you respond to Tessera's argument that you actually waived any issue with respect to the micro-PGA products? We did not, Your Honor. The complaint itself says that this is the subject of the ITC action, and it asks for a declaration of invalidity on the 106. And in the joint appendix on page 2,612 and 13, counsel is saying we would stop paying on all of our products if the 106 is invalid. And so far from being a waiver on the micro-PGA side, we actually were specifically saying we wouldn't pay on anything, which of course includes micro-PGA. You didn't seek a declaration of non-infringement on the micro-PGA products. Is that because you concede infringement? I wouldn't say that we concede infringement, but you are correct, Your Honor, that at the time the complaint was filed, we did not seek a declaration of non-infringement on micro-PGA. Except on the ground of invalidity. Except on the ground of invalidity. There's that tension between can you infringe but it's invalid, or if it's invalid you don't infringe. But yes, Your Honor, except for invalidity. If I could reserve the rest of my time. Yes. Mr. Lupton. Good morning, Your Honors. There are two separate and independent reasons for affirmance of Judge Wilkins' dismissal of the complaint. Your Honors talked with counsel for PTI about the first, which is that there is no case or controversy here. I'd like to touch on both of them, which is no case or controversy, and that Judge Wilkins properly exercised her discretion to dismiss the lawsuit because the lawsuit represents a terrible waste of judicial resources. Well, let's discuss the first case or controversy. Certainly, Your Honor. In the ITC appeal, you came here, and not you personally, I guess, but your firm argued that there was no license with respect to some of this product because the license payments had not been made in a timely manner and that therefore the sale of the product to the customers was infringing, correct? That is correct. So why doesn't that create a case or controversy? So there are two answers to that. First of all, Your Honor, that was and is Tessera's legal position, but as to PTI, it is 100% clear on this record and on the party's position that 100% of PTI's products are paid for and therefore even under Tessera's point of view, properly licensed. But MedImmune says if there is some sort of reasonable basis for them to believe that you're going to sue them, if there's some sort of controversy, why isn't the license agreement combined with the ITC action adequate under MedImmune to establish jurisdiction? Tessera has shown, it has demonstrated, that if you were to stop paying the royalties, we will go after those products. The ITC action is case in point on that. So why isn't that the something else that MedImmune and subsequent cases have looked at? There's a license and there's this something else. You've already shown your indication that you will be litigious with Powertech over its products if they were to stop paying. Well, actually what the record shows is that at Powertech's request, we went after unlicensed products in part to assist Powertech, and that's set forth in our brief and on pages, I think it's 5-6 of the record. That has nothing to do with the Powertech products. Those are products by Powertech competitors that might be entering, and they thought we've got a license with you, you've got to police. And it has to do with unlicensed products by Powertech's customers. So in connection with the ITC action. Wait, wait, wait. Powertech is not contending that you should go sue their customers for products that they purportedly sold to them under a license. They're not contending that. And in fact, Your Honor, we are not in the sense that no PTI products are at issue subject to an exclusion order in the ITC action. I don't understand that. You're being very precise with your words. Your infringement expert introduced schematics and information on the Powertech design. So how can you suggest that those are not at issue? The way it developed in the ITC action was, you know, this is an industry where it's not entirely clear when you find the products, the packaged semiconductors, what the source of those products are. And it developed somewhat fluidly in terms of what proof was put in about the types of packages that were sold by Alpida and by the other people who are sometimes customers of PTI. But what is clear and why I do want to be precise about what was happening in the ITC is that from its very inception, it was clear that licensed products are exempted from any risk of an exclusion order. Well, of course, but you said that it wasn't licensed because they didn't pay on time. That's right, Your Honor. But by the time PTI filed its complaint on March 5, 2010, towards the end of the ITC proceedings, everything was paid up. But why isn't the very fact that you did sue them when it wasn't timely enough to give the metamune jurisdiction that's necessary? They don't have to stop paying and get sued for metamune jurisdiction to exist. That's clear. So why isn't the fact that you did sue them when there was a delay in their payment enough to indicate that you're going to sue them again if they delay or don't pay? It is not the case, Your Honor, that we sued PTI, of course. We sued PTI's customers. We never said anything to PTI. We never did anything with respect to PTI. Because their customers would be licensed under the license to them. I would respectfully disagree that it makes no difference, Your Honor. This Court's decision in Microchip v. Chamberlain dealt with a similar issue where there was a manufacturer with a license or a covenant not to sue. The customers were subject to a lawsuit. And this Court said that wasn't the kind of legal adversity that creates a case or controversy. No, no, no. Come on. We've said since then that if your customers are being sued because of the product that you've sold to them, there's an implication that you are accusing them of induced or contributory infringement under the circumstances. I don't believe that's right, Your Honor. I'm not aware of any case in which the mere fact of suing a customer based on a product that was sold by a manufacturer creates a case or controversy. Well, Microchip was pre-Metamune. Metamune clearly broadened DJ jurisdiction. That is correct, that Microchip is pre-Metamune and that Metamune broadened DJ jurisdiction. But the portion of Metamune that discussed the legal adversity versus the economic adversity relating to a client has survived and is cited in cases like Benetech and district court cases. Let's assume for the moment that you're wrong about that and that in fact accusing the customer impliedly accuses Powertech as well. Then there's declaratory judgment jurisdiction, right? I would say no, Your Honor, for the reason that we are in a very different situation than Metamune in large part because of the contract between the parties, which is so different than the Metamune contract. That relates to the other issue. We'll get to that in a moment. But as to the first issue where they say you're accusing these products of being unlicensed, you're accusing our customers of infringement because the products are unlicensed, if we say that accusing the customer is the same as accusing the seller, then there is declaratory judgment jurisdiction, right? I would still say no, and I apologize if I'm mixing the two issues, Your Honor, but I do think that the fact that if they stopped paying on the contract based on something relating to the 106 would make no difference based on their royalty obligations is an important distinction with Metamune. Metamune was a fairly extreme case that asked the question only, do they have to terminate the agreement? But the agreement, regardless of whether you call it just for infringing products or not, it says expressly the minute they're late in a payment they become unlicensed regardless. So that creates the very scenario that you then used in the ITC, correct? That is Tessera's position, correct. So it sounds as though there's a controversy as to whether they're infringing, the customer is infringing when the payment is made late. I will point out, Your Honor, that of course, as Your Honor mentioned, this Court is going to rule on that issue. So Tessera has been very clear that what is exempted is licensed products. Your Honor is going to judge the contention that Judge O'Malley mentioned a moment ago, which is, is there a license for these exhaustion-type purposes only when it's paid, as Tessera argues, or merely because of the fact and the signature of the license as the respondents in the 630 ITC action argued. But your contention is even broader than that. You're saying that it's unlicensed if the royalties aren't paid as of the date of the importation, correct? No, that's not correct. I mean, this bleeds over into the other case. That's what you argued in the other Tessera case. Your Honor, I believe we've argued, and I've carefully listened to that argument before, Your Honor, that there is a grace period until the royalties are due. But they exceeded the grace period, right? I'm sorry? They exceeded the grace period. If they exceeded the grace period. You argue they did. Who's the they? And Tessera argued in the ITC case that they didn't pay on time and the products weren't licensed, right? Who is the they? Is it PTI? No. You argued that PTI's customers were not licensed because the license payments were made late. That is correct. That's certainly correct as to non-PTI products. And it is correct that we found out that there was a portion of the products on which PTI did not pay at all until they came current before they filed their declaratory relief claim. So that is correct, Your Honor. Okay. I'd like to go back for a minute because the only answer I got to my question about why this isn't completely under MedImmune was there's this microchip case and that suggests that a manufacturer can't come in when you sue their customers. My handy clerk, brilliant as he always is, gave me the information on microchip here and there was actually a covenant not to sue in microchip. That's right. Covenant not to sue microchip no matter what. So of course microchip in that case maybe couldn't come in. They were never under any threat of being sued. But here you've made it clear but for the license you would sue PowerTap. I don't think that that's correct, Your Honor. There is nothing in the record, nothing whatsoever to indicate that we would sue PowerTap. In fact, if PowerTap is intended to- Why don't you give them a covenant not to sue then? I'm sorry, Your Honor? Why don't you give them a covenant not to sue? They haven't asked for it. It hasn't been a subject of discussion and I don't think it's required under the case law. Yeah, but if you did it right now we could all walk out of here happy. It was a subject of discussion in the argument before the lower court and it was a subject of discussion in the briefs. I mean you've had plenty of opportunity to know that that's an issue and that many of the cases turn on that. I don't think that there's an obligation to present a SuperSAC type covenant in this case because SuperSAC relates to a situation where there is a very active case or controversy. We've sued PowerTap. We're proceeding down the road and then we want to divest the court of jurisdiction. In this case it is our contention that no case or controversy ever arose and it never arose because there is nothing in the record, not anything, that indicates that we would sue, as Your Honor asked, that we would sue PowerTap on the 106 patent. If they stopped paying tomorrow I don't think it would change this one wit in the sense of Well, let's turn to the second issue. Yes, Your Honor. Where they say, okay, forget about the controversy about whether the license payments were made on time. We want to stop paying in the future because we think our products are not within the scope of the patent claims and that the patent is invalid. And they are saying that under the Supreme Court's decision in Zenith, other decisions in the Supreme Court, it would be patent misuse to continue to collect if the products were outside the scope of the patent or if the patent were invalid. Under California law you would construe the contracts to avoid invalidity. Therefore, you should construe these contracts so that they do not extend to products outside the scope of the patent claims and they do not extend to products if the patent is invalid. That's their argument. That is. So what's the answer to it? The answer to that argument, Your Honor, is that the terms of the contract are quite unambiguous as to what they pay royalties on. And it does not turn on issues of patent infringement just under the plain terms of the agreement. Judge Wilkin had no problem reading the agreement and finding that that was very clear. There's a section, Section 3.B, which says you pay royalties on TCC-licensed products. You look up the definition of TCC-licensed products in Section 1A, and it has a technical definition end stop. This claim of patent misuse, which I will point out was not even mentioned below, is simply wrong as a matter of black-letter law. Zenith Radio recognized back in 1969 that the mere fact that you have a package license that requires the payment of royalties even under some circumstances when only some or none of the products are used is not, per se, patent misuse. The agreement that we have with PTI licenses literally hundreds of patents, and there's no particular reason to think that there's anything special about the 106 patent in particular. Okay, but you may be right about this argument, or you may be wrong. But what I understood the majority in MedImmune to say is that that's not a jurisdictional question for declaratory judgment purposes. That's a merits question, and that you only get to that after you determine that there's jurisdiction. And as long as there's an issue here to be litigated, there's declaratory judgment. So you may be right. They may be right. Who knows? We're certainly not going to decide here today whether construing the contract as you wish to would be patent misuse or whether the contract should be construed more narrowly. But there's an issue. And doesn't MedImmune say if there's an issue, there's declaratory judgment jurisdiction? Two things, Your Honor, and I see my time is almost out. The contract is so clear that I don't think there can be any real controversy about what it means. And I think the law is clear, and I don't think that that creates a controversy in particular because if you look at the declaratory relief that PTI requested, it's simply about invalidity and infringement of the 106 patent, infringement with respect to WBGA. It doesn't ask for a declaration about patent misuse or any other such issue. Well, but as I understand the argument, it's not so much that it's patent misuse, but that because under California law you should construe the contract to avoid the possible invalidity that the misuse comes in as a matter of contract construction. But it's clear simply from the black-letter law that that is not patent misuse. You can't, I don't think, create jurisdiction simply by asserting an argument that fails on its face. I wanted to turn you, you know your time is up, but I do want to hear what you have to say on the discretion. Because I'll tell you, it's kind of hard for me to imagine how it's not an abuse of discretion for the district court in this case not to entertain jurisdiction, assuming there's a case for controversy, given that under the contract they can only bring suit in this particular court. They can't bring suit anywhere else. So they can bring suit in this particular court, but the Forum Selection Clause is clear that it only relates to where they can file suit. There's nothing that we've found that stops a court from sua sponte, saying that a case should more appropriately go forward in another jurisdiction. But the contract would bar them from doing it. But the judge asked you that question, said, what if I transfer, can I transfer this? She opened the hearing with that, and you said no. You said no because of the Forum Selection Clause, and you said no, it shouldn't be transferred. So you specifically told the judge below that you didn't want it transferred and that it couldn't be because of the Forum Selection Clause. Right. But the court reached its own conclusion and said that sua sponte, she thinks it would be more appropriate for it to go forward in Texas. And she did no 1404 analysis. Yeah, it wasn't transferred, and they can't file in Texas. Isn't that convenient? The only, the other point that I'd like to mention to Your Honor, well, first of all, they've never tried to intervene in the Texas case, which, by the way, is a complete duplication of this case. In other words, it's the very customers. How could they intervene given the Forum Selection Clause? How could they intervene? They've never raised the issue with us. They've never tried. Are you going to waive the Forum Selection Clause? It's not clear to us. It's something we would consider if they would raise the issue. Even though you told the district court below here that you wouldn't? I think that that was an off-the-cuff answer to the district court when it raised the issue. The other point I want to make in response to Judge Moore's. Does that mean we shouldn't credit it? It's off-the-cuff, so like some of your remarks here should be credited? No, of course it should be credited. But I think that it was in the context of if that's what the PGI wanted to do, to intervene either in the ITC or in Texas, it could have tried to do that long ago. And in fact, you know, we've looked in advance of this argument to see whether intervention is the same as filing a complaint for purposes of the Forum Selection Clause. Couldn't find any guidance on that particular issue. If I could include one other fact in response to Your Honor's answer, a question. Even though Judge Wilkin was focused on the Texas case because it's an exact replica of the case that they're trying to bring, and so it's a big waste of judicial resources for it to go forward, there are three cases, as we mentioned in our statement of related cases, in the Northern District of California which actively raise the 106 patent. So those are other duplicative actions. And you agreed to stay those cases, but you moved to dismiss this one. You're not saying, okay, PGI, we'll allow you to be stayed along with everybody else. Well, it's our view, of course, that there's no case for controversy in this case. But if the court found that there was case for controversy, then it's a perfectly reasonable determination by Judge Wilkin that any claims by PGI should be included in another pending case. One last question on this issue. Doesn't our case law clearly say that if a judge is going to decline D.J. jurisdiction based on the existence of another action, that the judge has to actually walk through all the 1404 criteria? And she didn't do anything here. She just said, I think it should be in Texas, period. I don't think that this Court's case law says precisely that. I believe Your Honor is thinking about the Micron and Mossade case. And what they said, what this Court said was that there is a, that when there is a race to the courthouse, as may be more the case under MedImmune, then an analysis under the venue statute can be appropriate. Later cases, like the Innovative case, has said that it's not always required. And in the Selco case, for example, that we cite, there was dismissal in Virginia in favor of California. And you suggest that it's a waste of resources for this to go forward in California. That's right. Why? She's got three, there are three other cases there. California has presumably stayed them, but they're going to have to decide these issues anyway. Why wouldn't it be a much more sensible approach for her to have stayed this one along with those? Well, the Court, of course, viewed that there was no case for controversy. Assuming that we disagree with you on that. Well, apart from that, it should be, to the extent that they have an interest and a right, they should take steps to consolidate and to include themselves in another active case rather than proceed with their own duplicative action when there are already so many cases that are pending. And even if they... The judge could have just consolidated this one with the others. That could have been one option, but more appropriately she could dismiss it in light of their rights to attempt to participate in it. The other point about the Texas case is even if they can't... I think we're out of time, Mr. Littner. Thank you. Okay, thank you, Your Honor. Thank you, Your Honor. Just a few points very quickly. Particularly that didn't come out in argument, just for the Court's information, probably you know already, the Texas case has actually stayed as well. Nothing has ever happened in it. It has stayed before discovery, I think before a scheduling conference, before anything. So it's not like it's out in front of what would have happened had the Court kept the case in California. And what was the basis for the stay in the Texas case? The ITC action. On the 1404 factors, Tessera is actually located in the Northern District of California. That's why they put the forum selection clause there. Probably a 1404 motion in Texas would result in it being moved to California or Mandamus if it weren't granted. But the problem there with waiting for that is a delay of... I've seen as long as 18 months before a Texas court sometimes rules on a motion to transfer. On the microchip case, it's an interesting point. Apologies for raising it if it's not necessary for the decision, but it's really interesting. In microchip, that was on, as Your Honor has pointed out, it was the reasonable apprehension test. So a covenant not to sue would solve it. They had no reasonable apprehension of being sued. And then an indemnification may not correct that because economic injury alone, without a reasonable apprehension of suit, may not create a case or controversy. You said you've gotten a request for indemnification, but that was simply just a lawyer's statement. Are there any letters in support of that? I believe that there's a declaration, a statement in a declaration, that we've received a demand for indemnification. But you haven't agreed to it, right? We have. I think that's not in the record as to where that's come out. Is there a written indemnification agreement with the customers, or is this just a common law indemnification request? I believe so. I believe so. Let me get, Your Honor, the record site for that. That's all right. You can leave it. But with respect to this, if there's a demand for indemnification. But you didn't argue in the district court that there was an indemnification obligation existing, right? We argued that there had been a demand for indemnification, which creates at least a legal risk in a case or controversy as to whether that could occur. But the record wasn't developed as to what the indemnification obligation specifically was. Why didn't you ask for jurisdictional discovery with respect to your first argument? I think, honestly, Your Honor, I wasn't involved at that time. Mr. Croson is retired, and that's why I'm before Your Honors. But I think the short of it is that there was never really any question that the PTI products were accused of infringement in the ITC action, or that coverage of the patents over those products was a part of that case. And therefore, it was thought kind of like this is straightforward. This is so much more than just a letter. And because of the protective order, we couldn't go into the details of why that was the case. So would I do it now? Probably, because the district court, I think, made a mistake because we couldn't present all of the information in front of the district court. We did make a demand on the contract action. One other thing, Your Honor, is just to point out, in connection with whether the contract language is so painfully clear, on page 54 to 55 of our opening brief, we'll cite the UTAC case where this very language was interpreted by a California court as being ambiguous. And therefore, discovery and extrinsic evidence would be appropriate, which we obviously asked for and didn't get. All right. Thank you, Mr. Weiner. Thank you, Your Honor. All right. I thank both counsel. The case is submitted. Thank you.